IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
HARRISON DIVISION

CARL L. CANTRELL                                                                      PLAINTIFF

vs.                                         CIVIL NO. 06-3027

MICHAEL J. ASTRUE[1], Commissioner
SOCIAL SECURITY ADMINISTRATION                                                        DEFENDANT

### MEMORANDUM OPINION

Plaintiff, Carl Cantrell, brings this action pursuant to § 205(g) of the Social Security Act ("the Act"), 42 U.S.C. § 405(g), seeking judicial review of a final decision of the Commissioner of the Social Security Administration denying his applications for disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Act.

**Background:**

The applications for DIB and SSI now before this court were protectively filed on June 16, 2004, alleging an onset date of October 26, 2003, due to hypertension, mild congestive cardiomyopathy, bilateral mild to moderate mixed hearing loss, adjustment disorder with mild anxiety and depressed mood, a probable learning disorder, probable borderline mental retardation, lower back pain, and obesity. (Tr. 14, 52-54, 204-206, 224). An administrative hearing was held on January 13, 2006. (Tr. 217-250). Plaintiff was present and represented by counsel.

---

[1] Michael J. Astrue became the Social Security Commissioner on February 12, 2007. Pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure, Michael J. Astrue has been substituted for Commissioner Jo Anne B. Barnhart as the defendant in this suit.

AO72A
(Rev. 8/82)

At the time of the administrative hearing, plaintiff was 42 years old and possessed a ninth grade education. (Tr. 220). The record reveals that he had past relevant work ("PRW") experience as a truck driver. (Tr. 222).

The Administrative Law Judge ("ALJ") rendered an unfavorable decision on February 22, 2006. (Tr. 11-19). He concluded that plaintiff's impairments were severe but determined that they did not meet or medically equal any of the impairments listed in Appendix 1, Subpart P, Regulation No. 4. (Tr. 15). The ALJ then found that plaintiff retained the residual functional capacity ("RFC") to lift 25 pounds frequently and 50 pounds occasionally, sit for a total of six hours during an eight-hour workday, and stand and walk for a total of six hours during an eight-hour workday. However, the ALJ noted that plaintiff would need a job where excellent hearing was not required. The ALJ also found that plaintiff could understand, remember, and carry out simple job instructions and was able to relate to and interact appropriately with supervisors. (Tr. 16). With the assistance of a vocational expert, the ALJ then concluded that plaintiff could still perform his PRW as a truck driver. (Tr. 18-19).

On April 3, 2006, the Appeals Council declined to review this decision. (Tr. 3-5). Subsequently, plaintiff filed this action. (Doc. # 1). This case is before the undersigned by consent of the parties. Both parties have filed appeal briefs and the case is now ready for decision. (Doc. # 10, 11).

**Applicable Law:**

This Court's role is to determine whether the Commissioner's findings are supported by substantial evidence on the record as a whole. *Ramirez v. Barnhart*, 292 F.3d 576, 583 (8th Cir. 2002). Substantial evidence is less than a preponderance but it is enough that a reasonable mind would find it adequate to support the Commissioner's decision. The ALJ's decision must be affirmed if the record contains substantial evidence to support it. *Edwards v. Barnhart*, 314 F.3d 964, 966 (8th Cir. 2003). As long as there is substantial evidence in the record that supports the Commissioner's decision, the Court may not reverse it simply because substantial evidence exists in the record that would have supported a contrary outcome, or because the Court would have decided the case differently. *Haley v. Massanari*, 258 F.3d 742, 747 (8th Cir. 2001). In other words, if after reviewing the record it is possible to draw two inconsistent positions from the evidence and one of those positions represents the findings of the ALJ, the decision of the ALJ must be affirmed. *Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000).

It is well-established that a claimant for Social Security disability benefits has the burden of proving his disability by establishing a physical or mental disability that has lasted at least one year and that prevents him from engaging in any substantial gainful activity. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001); *see* 42 U.S.C. § § 423(d)(1)(A), 1382c(a)(3)(A). The Act defines "physical or mental impairment" as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § § 423(d)(3), 1382(3)(c). A plaintiff must show that his

3

disability, not simply his impairment, has lasted for at least twelve consecutive months. *Titus v. Sullivan*, 4 F.3d 590, 594 (8th Cir. 1993).

The Commissioner's regulations require her to apply a five-step sequential evaluation process to each claim for disability benefits: (1) whether the claimant has engaged in substantial gainful activity since filing his claim; (2) whether the claimant has a severe physical and/or mental impairment or combination of impairments; (3) whether the impairment(s) meet or equal an impairment in the listings; (4) whether the impairment(s) prevent the claimant from doing past relevant work; and, (5) whether the claimant is able to perform other work in the national economy given his age, education, and experience. *See* 20 C.F.R. § § 404.1520(a)- (f)(2003). Only if the final stage is reached does the fact finder consider the plaintiff's age, education, and work experience in light of his or her residual functional capacity. *See McCoy v. Schweiker*, 683 F.2d 1138, 1141-42 (8th Cir. 1982); 20 C .F.R. § § 404.1520, 416.920 (2003).

**Evidence Presented:**

Plaintiff reported to Cardiovascular Associates of North-Central Arkansas on July 20, 2000, with complaints of exertional chest pain that had been increasing in frequency. (Tr. 193-195). Plaintiff also related some episodes of near-syncope, shortness of breath, and diaphoresis with no radiation. He denied palpations but reported an increased heart rate associated with these episodes. Left heart catheterization, left ventricular angiography, coronary angiography and aortic root angiography were ordered. A left ventriculography revealed anterior mild hypokinesis with distal inferior and apical hypokinesis with multiple PVCs and no mitral regurgitation and an ejection fraction mildly reduced to 45% to 50% indicating mild left ventricular dysfunction. (Tr. 199).

Plaintiff was discharged home on aspirin therapy and a low-dose ace inhibitor. (Tr. 197).

Plaintiff was treated at Calico Rock Medical Center Clinic from April 2001 to May 2002 for gastroesophageal reflux disease ("GERD"), peptic ulcer disease and hypertension. Plaintiff was also seen at Calico Rock Medical Center Clinic on April 5, 2001, for a follow-up after an emergency room visit on April 3, 2001. (Tr. 124). He complained of pain and soreness in his chest. X-rays showed cardiomyopathy with increased interstitial markings. (Tr. 125). The doctor prescribed Diovan. (Tr. 124).

On May 7, 2001, plaintiff was diagnosed with cardiomyopathy, diastolic dysfunction, and systolic dysfunction. (Tr. 123). The doctor prescribed Accupril. (Tr. 123).

On May 22, 2002, a physician from the Medical Center of Calico Rock reported that plaintiff's hypertension and GERD were under good control. (Tr. 120). Plaintiff was reportedly taking Diovan and Prevacid. (Tr. 120).

On October 30, 2003, plaintiff began seeing Dr. W. M. Wells at the Christian Health Center. (Tr. 133). He presented with a history of hypertension and indicated that he was taking Atenolol and a diuretic. Although his blood pressure was close to normal, Dr. Wells added Dyazide to his medication regime. (Tr. 133).

On December 4, 2003, plaintiff's blood pressure was elevated at 158/96. (Tr. 132). He indicated that he had been under stress and was having difficulty sleeping. Apparently plaintiff was going through a divorce. Dr. Wells increased his Atenolol dosage and directed him to continue the Dyazide at its current dosage. (Tr. 132).

5

On January 8, 2004, medical records from the Christian Health Center indicated that plaintiff was taking Dyazide and Atenolol to lower his blood pressure. (Tr. 131). Dr. Wells noted that plaintiff's blood pressure had improved on these medications. However, it remained elevated. Therefore, Dr. Wells increased plaintiff's dosage of Atenolol. (Tr. 131).

On February 11, 2004, plaintiff sought emergency treatment for upper abdominal pain. (Tr. 116). Plaintiff also reported a history of back pain, which the doctor noted could be caused by degenerative joint disease with nerve impingement in the cervical spine. He prescribed Prilosec and directed plaintiff to take Ibuprofen for his pain. The doctor also recommended that plaintiff undergo a colonoscopy. (Tr. 116).

On February 12, 2004, plaintiff was treated for stomach pain and left arm pain with numbness for the left hand up to the shoulder. (Tr. 130). Dr. Wells prescribed a clear liquid diet graduating to soft foods and Prevacid to be taken twice per day for one week. (Tr. 130).

On March 11, 2004, medical records showed that plaintiff's blood pressure was under good control. (Tr. 129). However, he complained of chronic heartburn. As such, Dr. Sarah Carter prescribed Ranitidine. She also noted that plaintiff was taking Dyazide and Atenolol to control his blood pressure. (Tr. 129).

On April 8, 2004, plaintiff reportedly injured his back lifting logs. (Tr. 128). As such, he was experiencing lower back pain. (Tr. 128). Plaintiff's blood pressure was also noted to be 152/106. The doctor noted muscle spasms in the right lower back and diagnosed plaintiff with muscle strain. He then prescribed Flexeril and increased plaintiff's dosage of Atenolol.

On May 6, 2004, Dr. Wells noted that plaintiff had gained 29 pounds since February. (Tr. 127). Plaintiff also voiced some concerns regarding his lack of energy and inability to work without getting tired. He indicated that he was planning to see a cardiologist. Dr. Wells discussed with plaintiff his caloric intake and the need for him to work on his weight. However, he noted that plaintiff seemed insulted by this. Dr. Wells prescribed Ranitidine for plaintiff's stomach problems and Cyclobenzaprine to help with his muscle soreness. (Tr. 127).

On June 17, 2004, plaintiff had a follow-up appointment concerning his hypertension and GERD. (Tr. 126). Records indicated that he had no symptoms and that his blood pressure was well controlled. As such, Dr. Wells advised him to continue with his current medications. (Tr. 126).

On August 11, 2004, Dr. K. Simon Abraham performed a general physical examination of plaintiff. (Tr. 134-141). Plaintiff complained of shortness of breath on exertion, difficulty walking more than a block without becoming short of breath, chest pain, lower back pain, hypertension, and GERD. (Tr. 134). Dr. Abraham described plaintiff as a "very sturdy, strong man" with "rough calloused hands" and "a pot belly." (Tr. 136). A physical examination revealed a full range of motion in the cervical and lumbar spine, no muscle spasms in his back, and a full range of motion in the upper and lower extremities. (Tr. 137). Neurologically, plaintiff was intact and had no muscle weakness, atrophy, or sensory abnormalities. Further, his gait and coordination were normal, and he could stand and walk without assistive devices, walk on his heels and toes, and squat and arise from a squatting position. (Tr. 138). Dr. Abraham reported that plaintiff could hold a pen and write, touch his fingertips to his palms, oppose his thumbs to his fingers, pick up a coin, and grip with 100% grip strength. (Tr. 138). Plaintiff's ears were also noted to be normal and he was found to be

able to hear normal conversation. (Tr. 136). X-rays revealed an enlarged heart with a left ventricular contour and a prominent aortic knob, indicative of cardiomyopathy (probably as a result of hypertension). (Tr. 140). Dr. Abraham diagnosed plaintiff with atypical chest pain, lower back pain, hypertension, and obesity. (Tr. 141). He then concluded that plaintiff could walk, stand, sit, lift, and carry without limitations. (Tr. 141).

On August 23, 2004, Dr. Robert Hudson, a clinical psychologist, performed a mental status and adaptive functioning evaluation of plaintiff. (Tr. 143-146). Dr. Hudson reported that plaintiff's depression and/or anxiety was relatively mild; that plaintiff came across as a reasonably bright man and did not appear to be mentally retarded; that he had a severe hearing problem but could communicate; and, that he had no social limitations. (Tr. 144-146). He diagnosed plaintiff with adjustment disorder with mixed anxiety and depressed mood, a learning disorder not otherwise specified, borderline mental retardation rule out mild mental retardation, a history of possible heart problems, lower back pain, high blood pressure, GERD, and fatigue. (Tr. 145). Dr. Hudson concluded that plaintiff could understand, carry out, and remember instructions in employment situations, and that nothing suggested that he would have difficulty responding appropriately to supervisors and/or co-workers. (Tr. 146).

On September 27, 2004, plaintiff was evaluated by Dr. Stephen Cashman regarding his hearing loss. (Tr. 148). Testing revealed bilateral mild to moderate mixed hearing loss with a significant conductive component present. Dr. Cashman diagnosed plaintiff with chronic otitis media with effusion and mixed hearing loss. He recommended an evaluation for myringotomy with PE tube placement and a repeat audio after the tubes were in place to see if the conductive

component of his hearing loss responded to the tube placement. Dr. Cashman suspected that this would significantly improve plaintiff's hearing. He indicated that another alternative would be a hearing aid. (Tr. 148).

On January 26, 2005, an x-ray examination of plaintiff's chest showed an enlarged heart but no infiltrate or mass, no heart failure, and clear pleural spaces. (Tr. 177). A EKG revealed sinus rhythm with sinus arrhythmia. (Tr. 180). However, plaintiff was diagnosed with early right middle lobe pneumonia. (Tr. 179).

**Discussion:**

We first address the ALJ's assessment of plaintiff's subjective complaints. The ALJ was required to consider all the evidence relating to plaintiff's subjective complaints including evidence presented by third parties that relates to: (1) plaintiff's daily activities; (2) the duration, frequency, and intensity of his pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness, and side effects of his medication; and (5) functional restrictions. *See Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984). While an ALJ may not discount a claimant's subjective complaints solely because the medical evidence fails to support them, an ALJ may discount those complaints where inconsistencies appear in the record as a whole. *Id*. As the United States Court of Appeals for the Eighth Circuit recently observed, "Our touchstone is that [a claimant's] credibility is primarily a matter for the ALJ to decide." *Edwards v. Barnhart*, 314 F.3d 964, 966 (8th Cir. 2003).

After reviewing the record, we believe that the ALJ adequately evaluated the factors set forth in *Polaski*, and conclude there is substantial evidence supporting his determination that plaintiff's

9

complaints were not fully credible. The testimony presented at the hearing as well as the medical evidence contained in the record are inconsistent with plaintiff's allegations of disability.

The record currently before the court reveals that plaintiff did not seek extensive medical treatment for any of his alleged impairments during the relevant time period. *See Edwards v. Barnhart*, 314 F.3d at 967 (holding that ALJ may discount disability claimant's subjective complaints of pain based on the claimant's failure to pursue regular medical treatment). While the record does show that plaintiff has been diagnosed with cardiomyopathy and hypertension, he did not seek any treatment for the cardiomyopathy during the relevant time period. *See Trenary v. Bowen*, 898F.2d 1361, 1364 (8th Cir. 1990) (holding that a mere diagnosis is not sufficient to prove disability, absent some evidence to establish a functional loss resulting from that diagnosis). In fact, in July 2000, a heart catheterization revealed an ejection fraction rate of 45-50 percent, which indicated only mild left ventricular dysfunction. (Tr. 199). *See* 20 C.F.R. Pt. 404, subpart. P, App. 1, § 4.04 (requiring a left ventricular ejection fraction of thirty percent or less and a cardiologist's conclusion that the performance of an exercise test will present a significant risk to the individual to meet the listing). The record contains no objective medical evidence to suggest that plaintiff's mild cardiomyopathy prevented him for performing any work-related activities. *See Forte v. Barnhart*, 377 F.3d 892, 895 (8th Cir. 2004) (holding that lack of objective medical evidence is a factor an ALJ may consider).

Follow-up records concerning plaintiff's hypertension also indicate that plaintiff's condition was amenable to treatment. *See Roth v. Shalala*, 45 F.3d 279, 282 (8th Cir. 1995) (holding that a condition that can be controlled or remedied by treatment cannot serve as a basis for a finding of

disability). He was prescribed Atenolol, Diovan, and Dyazide. (Tr. 120, 124, 128, 129, 131, 132, 133). Dr. Wells noted that plaintiff's blood pressure improved with the use of these medications. (Tr. 120, 126, 129, 131, 133). As plaintiff's condition clearly responded to treatment, it does not support a finding of disabled. *Id*.

We also note that, in spite of plaintiff's heart condition, he has continued to work, albeit part-time, as a logger, since his alleged onset date. (Tr. 226-227). Although the ALJ concluded that this work did not rise to the level of substantial gainful activity, it does demonstrate plaintiff's ability to perform some work. As such, it belies a finding of total disability. *See Gregg v. Barnhart*, 354 F.3d 710, 713 (8th Cir. 2003) (holding that ability to perform part-time work belied plaintiff's claim of disability).

At the hearing, plaintiff testified that he was not currently taking his blood pressure medication because he was unable to afford to do so. *See Dunahoo v. Apfel*, 241 F.3d 1033, 1038 (8th Cir. 2001) (holding that claimant's failure to follow prescribed course of treatment weighed against credibility when assessing subjective complaints of pain). However, the record also reveals that plaintiff was receiving treatment from a free medical clinic. (Tr. 225). In fact, he was receiving his medications free of charge. (Tr. 225). There is no evidence in the record to show that plaintiff was ever denied treatment or medication due to his inability to pay.

To the extent plaintiff contends that he was unable to obtain medical assistance and medication due to his inability to afford gas for his vehicle, we also find this argument to be unpersuasive. As previously mentioned, the record reveals that plaintiff continued to work on a part-time basis. Although it is not clear how plaintiff was transported to and from work, we believe that

AO72A
(Rev. 8/82)

his ability to get to and from work is sufficient to show that he could have obtained transportation for his medical appointments. Therefore, we do not find that plaintiff's financial situation excuses his failure to obtain consistent medical treatment or take his medications as prescribed.

Plaintiff also alleges disability due to a hearing impairment. Hearing tests reveal that plaintiff suffered from bilateral mild to moderate mixed hearing loss. (Tr. 148). Dr. Cashman diagnosed plaintiff with chronic otitis media with effusion and mixed hearing loss. He was of the opinion that this condition could be treated via myringotomy with PE tube placement. (Tr. 148). However, plaintiff failed to follow through with treatment. *See id*.

We also note that following a general physical exam, Dr. Abraham determined that plaintiff was able to hear normal conversations. (Tr. 136). Additionally, the record is devoid of evidence to suggest that plaintiff had difficulty hearing or understanding his attorney or the ALJ at the administrative hearing. *See Lacroix v. Barnhart*, 465 F.3d 881, 889 (8th Cir. 2006) (holding that fact that plaintiff used hearing aides, read lips, and did not experience difficulty hearing or understanding the ALJ weighed against her claim for disability). Therefore, we find substantial evidence to support the ALJ's determination that plaintiff's hearing impairment was not disabling.

Plaintiff also contends that he suffers from a disabling mental impairment. However, the objective medical evidence does not support this assertion. In fact, plaintiff was treated only once for symptoms related to depression/anxiety. *See Dunahoo*, 241 F.3d at 1037 ; *see also Hutton v. Apfel*, 175 F.3d 651, 655 (8th Cir. 1999) (failure of claimant to maintain a consistent treatment pattern for alleged mental impairments is inconsistent with the disabling nature of such impairments). In December 2003, plaintiff reported problems with stress and sleeping. (Tr. 132).

12

No medication was prescribed. *See Jones v. Callahan*, 122 F.3d 1148, 1153 (1997) (holding that ALJ properly concluded claimant's mental impairment was not severe where he was not undergoing regular mental health treatment or regularly taking psychiatric medications). Then, in August 2004, when Dr. Hudson performed a mental status and adaptive functioning evaluation of plaintiff, he determined that plaintiff's depression/anxiety was relatively mild. (Tr. 143-146). In fact, Dr. Hudson found that plaintiff was capable of understanding, carrying out, and remembering employment instructions and would have no difficulty interacting with supervisors or co-workers. (Tr. 146).

Although Dr. Hudson diagnosed plaintiff with borderline intellectual functioning (BIF) and possible mental retardation, no objective I. Q. testing was performed. (Tr. 144-146). Records indicate that plaintiff had worked with these conditions for a number of years. *See Gowell v. Apfel*, 242 F.3d 793, 798 (8th Cir. 2001) (claimant worked with her impairments for years). In fact, plaintiff had even worked since his alleged onset date. *See Nettles v. Sullivan*, 956 F.2d 820, 823 (8th Cir. 1992). As such, based on the evidence as a whole, we do not find plaintiff's probable BIF to be disabling.

Records reveal that plaintiff had also sought treatment for GERD and hematochezia (bloody stools). (Tr. 120, 124, 129). For this, plaintiff was prescribed Prevacid and Ranitidine (Zantac). In May 2002, plaintiff's GERD was said to be under good control. Although he continued to have occasional flare ups of stomach pain and hematochezia, plaintiff's condition has remained amenable to conservative treatment measures. *See Roth*, 45 F.3d at 282. Plaintiff was never hospitalized for this condition and there is no evidence to show that his health deteriorated as a result of this

impairment. In February 2004, a doctor recommended that plaintiff undergo a colonoscopy but plaintiff failed to do so. *See Dunahoo*, 241 F.3d at 1038. Had plaintiff's condition been disabling, we believe that plaintiff would have undergone the recommended testing.

Plaintiff also complains of disabling lower back pain and obesity. However, the record contains minimal evidence concerning plaintiff's alleged back pain. The record contains no evidence that plaintiff was ever prescribed pain medication to treat this impairment. *See Haynes v. Shalala*, 26 F.3d 812, 814 (8th Cir. 1994) (lack of strong pain medication was inconsistent with disabling pain); *Goff v. Barnhart*, 421 F.3d 785, 793 (8th Cir. 2005) (failure to take pain medication is relevant to the credibility determination). In fact, in spite of plaintiff's subjective complaints, Dr. Abraham's physical examination of plaintiff revealed a full range of motion in plaintiff's cervical and lumbar spine, no muscle spasms in his back, and a full range of motion in his upper and lower extremities. (Tr. 137). Neurologically, plaintiff was also intact and had no muscle weakness, atrophy, or sensory abnormalities. His gait and coordination were normal, and he could stand and walk without assistive devices, walk on his heels and toes, and squat and arise from a squatting position. (Tr. 138). Dr. Abraham reported that plaintiff could hold a pen and write, touch his fingertips to his palms, oppose his thumbs to his fingers, pick up a coin, and grip with 100% grip strength. (Tr. 138).

Likewise, there is no evidence to show that plaintiff's obesity prevented him from performing work-related activities. On the one occasion when plaintiff's doctor attempted to address this issue with plaintiff, plaintiff became offended. (Tr. 127). As previously noted, plaintiff remained able to work part-time, despite this alleged impairment. *See Nettles*, 956 F.2d at 823.

Plaintiff own reports of his level of activity also undermines his subjective complaints. On July 29, 2004, plaintiff completed a Disability Supplemental Interview Outline indicating that he was able to care for his personal hygiene, wash and repair his car, shop for groceries, run errands to the post office, prepare meals, pay bills, count change, drive, watch television, listen to the radio, and visit with friends and family. (Tr. 79-80). Plaintiff also stated that he talked on the phone and played on his family or friends' computers "now and then." (Tr. 82). In addition, he testified that he had worked part-time as a logger as recently as 2005. (Tr. 226-227). Plaintiff also told Dr. Hudson that, if he were to live alone, he could clean and cook well enough to "get by." (Tr. 146). Further, he stated that he mowed the grass, carried out the trash, and cut "a few posts." (Tr. 145, 146). *See Pena v. Chater*, 76 F.3d 906, 908 (8th Cir. 1996) (ability to care for one child, occasionally drive, and sometimes go to the store); *Nguyen v. Chater*, 75 F.3d 429, 430-31 (8th Cir. 1996) (ability to visit neighbors, cook, do laundry, and attend church); *Novotny v. Chater*, 72 F.3d at 671 (ability to carry out garbage, carry grocery bags, and drive); *Johnston v. Shalala*, 42 F.3d 448, 451 (8th Cir. 1994) (claimant's ability to read, watch television, and drive indicated his pain did not interfere with his ability to concentrate); *Woolf v. Shalala*, 3 F.3d 1210, 1213-1214 (8th Cir. 1993) (ability to live alone, drive, grocery shop, and perform housework with some help from a neighbor). Clearly, this level of activity is inconsistent with plaintiff's allegations of disability.

We also note that plaintiff's girlfriend testified on his behalf. (Tr. 240-243). The ALJ properly considered her testimony but found it unpersuasive. We hold that this determination was well within the ALJ's province. *See Siemers v. Shalala*, 47 F.3d 299, 302 (8th Cir. 1995); *Ownbey v. Shalala*, 5 F.3d 342, 345 (8th Cir. 1993).

Therefore, although it is clear that plaintiff suffers from some degree of pain, he has not established that he is unable to engage in any and all gainful activity. *See Craig v. Apfel*, 212 F.3d 433, 436 (8th Cir. 2000) (holding that mere fact that working may cause pain or discomfort does not mandate a finding of disability); *Woolf v. Shalala*, 3 F.3d at 1213 (holding that, although plaintiff did have degenerative disease of the lumbar spine, the evidence did not support a finding of disabled). Neither the medical evidence nor the reports concerning his daily activities supports plaintiff's contention of total disability. Accordingly, we conclude that substantial evidence supports the ALJ's conclusion that plaintiff's subjective complaints were not totally credible.

Plaintiff also contends that the ALJ erred in finding that he maintained the RFC to perform a range of medium work. It is well settled that the ALJ "bears the primary responsibility for assessing a claimant's residual functional capacity based on all relevant evidence." *Roberts v. Apfel*, 222 F.3d 466, 469 (8th Cir. 2000). The United States Court of Appeals for the Eighth Circuit has also stated that a "claimant's residual functional capacity is a medical question," *Singh v. Apfel*, 222 F.3d 448, 451 (8th Cir. 2000), and thus, "some medical evidence," *Dykes v. Apfel*, 223 F.3d 865, 867 (8th Cir. 2000) (per curiam ), must support the determination of the plaintiff's RFC, and the ALJ should obtain medical evidence that addresses the claimant's "ability to function in the workplace." *Nevland v. Apfel*, 2 04 F.3d 853, 858 (8th Cir. 2000). Therefore, in evaluating the plaintiff's RFC, *see* 20 C.F.R. § 404.15459(c), while not limited to considering medical evidence, an ALJ is required to consider at least some supporting evidence from a professional. *Cf. Nevland v. Apfel*, 204 F.3d at 858; *Ford v. Secretary of Health and Human Servs.*, 662 F. Supp. 954, 955, 956 (W.D. Ark. 1987)

(RFC was "medical question," and medical evidence was required to establish how claimant's heart attacks affected his RFC).

In the present case, the ALJ considered the medical assessments of non-examining agency medical consultants, a general physical examination, plaintiff's subjective complaints, and his medical records. On September 10, 2004, Dr. Kathryn Gale, a non-examining, consultative psychologist, completed a psychiatric review technique form. (Tr. 157-170). After reviewing plaintiff's medical records, she diagnosed him with adjustment disorder with mixed features. (Tr. 160). Dr. Gale concluded that plaintiff's mental impairment resulted in only mild restrictions with regard to activities of daily living; social functioning, and, concentration, persistence, and pace. (Tr. 167). Further, she found no episodes of decompensation. (Tr. 167).

On October 5, 2004, Dr. Robert Redd, a non-examining, consultative physician, reviewed plaintiff's medical records and concluded that he suffered from a non-severe physical impairment. (Tr. 173).

On November 23, 2004, Dr. Alice Davidson, a non-examining, consultative physician, completed an RFC assessment. (Tr. 149-156). After reviewing plaintiff's medical records, she concluded that plaintiff could lift 25 pounds frequently and 50 pounds occasionally, as well as sit, stand, and walk about 6 hours during an 8 hour workday. (Tr. 150). She also noted that plaintiff's hearing was limited and that he should not perform jobs requiring excellent hearing. (Tr. 153).

Dr. Abraham also examined plaintiff and noted a full range of motion in the cervical and lumbar spine without muscle spasms and a full range of motion in the upper and lower extremities. (Tr. 137). Neurologically, plaintiff was intact and had no muscle weakness, atrophy, or sensory

17

AO72A
(Rev. 8/82)

abnormalities. Further, his gait and coordination were normal, and he could stand and walk without assistive devices, walk on his heels and toes, and squat and arise from a squatting position. (Tr. 138). Dr. Abraham reported that plaintiff could hold a pen and write, touch his fingertips to his palms, oppose his thumbs to his fingers, pick up a coin, and grip with 100% grip strength. (Tr. 138). Plaintiff's ears were also noted to be normal and he was found to be able to hear normal conversation. (Tr. 136). After diagnosing plaintiff with atypical chest pain, lower back pain, hypertension, and obesity, Dr. Abraham concluded that he could walk, stand, sit, lift, and carry without limitations. (Tr. 141). Accordingly, we find substantial evidence to support the ALJ's RFC assessment.

We also find that substantial evidence supports the ALJ's finding that plaintiff can return to his PRW. In a hypothetical question to the VE, the ALJ asked the VE to assume that the applicant had the same education and experience as plaintiff and could lift and/or carry up to fifty pounds occasionally and twenty-five pounds frequently; stand/and or walk for at least six hours out of an eight-hour day; and, sit for at least six hours of an eight-hour day. (Tr. 246). The ALJ also asked the VE to assume that the individual would need a job where excellent hearing was not required. Further, the ALJ stated that plaintiff would only be able to understand, remember, and carry out simple job instructions. (Tr. 246-247). Based on this hypothetical, the VE testified that plaintiff could return to his PRW as a truck driver, as that position is performed in the national economy. *See Long v. Chater*, 108 F.3d 185, 188 (8th Cir. 1997); *Pickney v. Chater*, 96 F.3d 294, 296 (8th Cir. 1996).

Plaintiff, however, contends that the ALJ erred in making this conclusion because his PRW, as he performed it, was classified as heavy work. However, there is no absolute requirement that the ALJ make findings based on the actual functional demands of a past relevant job. Instead, the findings may be based on the functional demands and job duties of the occupation as generally required by employers throughout the national economy. *Evans v. Shalala*, 21 F.3d 832, 833-34 (8th Cir. 1994); *Kirby v. Sullivan*, 923 F.2d 1323, 1326 (8th Cir. 1991); *Martin v. Sullivan*, 901 F.2d 650, 653 (8th Cir. 1990) (rejecting only past relevant job analysis). The latter may be determined by the Dictionary of Occupational Titles. *Evans*, 21 F.3d at 834; *Kirby*, 923 F.2d at 1327.

We note that the Dictionary of Occupational Titles does contains truck driver positions that are classified as both medium and light level work. *See* DICTIONARY OF OCCUPATIONAL TITLES §§ 902-906, *at* www.westlaw.com. Accordingly, we find substantial evidence to support the ALJ's determination that plaintiff can return to his PRW.

**Conclusion:**

Accordingly, having carefully reviewed the record, the undersigned finds substantial evidence supporting the ALJ's decision denying the plaintiff benefits, and thus the decision should be affirmed. The undersigned further finds that the plaintiff's Complaint should be dismissed with prejudice.

DATED this <u>30th</u> day of March 2007.

/s/ *J. Marschewski*
HON. JAMES R. MARSCHEWSKI
UNITED STATES MAGISTRATE JUDGE

AO72A
(Rev. 8/82)